**Opinion filed January 15, 2026**



# In The

# Eleventh Court of Appeals

_____

## No. 11-23-00102-CR

_____

## ARTHUR GILMER CROSS JR., Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 29th District Court**
**Palo Pinto County, Texas**
**Trial Court Cause No. 17958**

## O P I N I O N

Appellant, Arthur Gilmer Cross Jr., was indicted for delivery of four grams or more but less than two hundred grams of a controlled substance, to wit: methamphetamine, a first-degree felony. TEX. HEALTH & SAFETY CODE ANN. § 481.112(d) (West Supp. 2025); TEX. PENAL CODE ANN. § 12.32(a) (West 2019). For punishment enhancement purposes, the State also alleged that Appellant had previously been finally convicted of four felony offenses. PENAL § 12.42(d) (West

Supp. 2025). The jury convicted Appellant of the charged offense, found each enhancement allegation to be "true," and assessed his punishment at life imprisonment in the Texas Department of Criminal Justice, Institutional Division. The trial court sentenced him accordingly.

Appellant raises four issues on appeal: (1) the evidence is insufficient to support his conviction because the State failed to disprove his entrapment defense beyond a reasonable doubt; (2) excluding the testimony of the State's confidential informant, the remaining evidence is legally insufficient to connect Appellant to the commission of the charged offense; (3) Appellant's waiver of the right to counsel was neither knowingly nor voluntarily made, and thus is invalid, and he was deprived of adequate counsel; and (4) Appellant's life sentence is grossly disproportionate to the charged offense and violates his Eighth Amendment protections against cruel and unusual punishment.[1] We affirm.

## I. *Factual Background*

At a pretrial proceeding, Appellant informed the trial court that he preferred to have a different attorney to represent him in the case, rather than his current court-appointed trial counsel.[2] Appellant complained that his court-appointed trial counsel was not sufficiently defending him and, in fact, was instead helping the State convict him. Appellant's court-appointed trial counsel advised the trial court that he had

---

[1]Appellant's first court-appointed appellate counsel submitted an *Anders* brief and filed a motion to withdraw. *See Anders v. California*, 386 U.S. 738 (1967). Following the procedures set forth in *Anders*, *Kelly v. State*, 436 S.W.3d 313 (Tex. Crim. App. 2014), and *In re Schulman*, 252 S.W.3d 403 (Tex. Crim. App. 2008), we independently reviewed the record and concluded that this appeal is not particularly amenable to disposition under *Anders*. We granted counsel's motion to withdraw, abated the appeal, and remanded the cause to the trial court with instructions to appoint other appellate counsel. New appellate counsel was directed to file a brief on the merits and address any substantive issues that appellate counsel deemed to be arguable. This appeal was reinstated after the trial court appointed new appellate counsel.

[2]Appellant's court-appointed trial counsel represented him in two pending criminal cases, only one of which was the subject of the trial below and is the subject of this appeal; Appellant sought to remove trial counsel in both cases.

reviewed the entire case file, reviewed with Appellant the videos of two drug purchases captured by the State's confidential informant, and prepared Appellant's case for trial appropriately. The trial court denied Appellant's request. Appellant then inquired if he could represent himself; the trial court informed him that it would address that request before voir dire.

Prior to voir dire, Appellant again requested a different court-appointed trial counsel and stated that he wanted to represent himself. The trial court informed him that (1) he did not have the option to select who his court-appointed counsel would be, (2) his current court-appointed trial counsel was very experienced, and (3) there were just a few—only two or three—available attorneys on its appointment list. The trial court read the charges to Appellant and Appellant stated that he understood them. The trial court then explained to Appellant that the attorney who had been appointed as his trial counsel was very experienced and a former district attorney of the county; Appellant agreed that he did not doubt counsel's competency. Instead, Appellant's primary complaints were that counsel had not obtained any witnesses for his defense or filed any motions that Appellant believed should have been presented to the trial court, namely a motion for discovery and a motion to suppress evidence. Appellant's court-appointed trial counsel explained to the trial court that he had reviewed the discovery material provided by the State with Appellant and would provide it to him in accordance with Article 39.14 of the Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 39.14 (West Supp. 2025).

The trial court proceeded to administer oral and written admonishments to Appellant regarding his self-representation request. The trial court warned Appellant of the "extreme dangers with [Appellant] choosing to represent [him]self" and informed Appellant that, in ten years on the bench, no defendant had ever chosen to represent himself in a criminal case. The trial court thoroughly admonished Appellant that (1) the jury likely would perceive him negatively if he represented

3

himself, (2) Appellant would be better off with court-appointed trial counsel even if counsel did not fulfill his duties, and (3) Appellant had no experience or training in the applicable law or trial procedure, including the rules of evidence, the code of criminal procedure, how to conduct voir dire, make appropriate motions, examine witnesses, introduce evidence or object to it being admitted, or preserve error for appeal. Appellant responded and said, among other things: "I have been in trials before. . . . I done [sic] filed cases before. . . . I filed my own motions in federal court and everything." He also stated: "I know I'm better off with a representative. I know that. I want to get an attorney. But I -- there's no way that I could feel comfortable . . . with this man as my lawyer."

The trial court warned Appellant that: "I would strongly advise you to have [court-appointed trial counsel] represent you." The trial court concluded its admonishments by warning Appellant that, in its opinion, Appellant was "making a bad decision by not having [Appellant's court-appointed trial counsel] sit there with [him] at this trial. I can't stress that enough." The trial court also informed Appellant that his court-appointed trial counsel would remain in the courtroom, as standby counsel, throughout the trial and be available to consult with Appellant, if Appellant so requested. Later, during trial, the trial court also reminded Appellant that his standby counsel could resume representing him during the trial, but Appellant refused.

After these oral admonishments, the trial court presented Appellant with written admonishments and a written waiver of the right to counsel and, after Appellant read them, asked Appellant if he had any questions about these documents and if he still desired to represent himself. Appellant replied that he had no questions and that he still desired to represent himself. After Appellant signed the written admonishments and waiver, the trial court asked him whether he had signed them freely and voluntarily; Appellant replied that he did. The trial court then asked

4

Appellant: "Do you waive your right to counsel in this case to represent you freely and voluntarily?" to which Appellant replied: "Yes sir." Appellant proceeded to trial pro se, and Appellant's court-appointed trial counsel remained available throughout the proceedings as standby counsel.

At times during trial, Appellant expressed confusion about the two videos that captured his drug transactions with law enforcement's confidential informant, and he expressed doubt that the videos presented at trial were the same videos he had previously reviewed with his court-appointed trial counsel. These concerns were clearly and repeatedly addressed by the trial court. In an extended colloquy outside the presence of the jury, and before the video depicting the drug transaction for which Appellant was on trial was introduced, the trial court confirmed with Appellant's standby counsel that Appellant had previously reviewed the forty-five-minute video in its entirety. The trial court also addressed Appellant's handwritten motion for continuance to prepare for trial and obtain additional counsel, as well as his complaints that his former court-appointed trial counsel had not filed the motions he requested or secured the attendance of any witnesses for trial.

The trial court explained to Appellant that although he was dissatisfied with his court-appointed trial counsel's performance, counsel had informed the trial court that he had done everything he deemed appropriate in his professional judgment in the case, that counsel was a highly experienced criminal defense attorney, and that he had received and reviewed all the discovery available under the law from the district attorney's office, which negated the need to file a motion for discovery. The trial court then informed Appellant that he could choose to have his now-standby counsel resume his representation or he could continue to represent himself. Appellant stated that he would represent himself but complained that he was not prepared to do so. The trial court responded that Appellant's former court-

5

appointed, and now standby trial counsel had been prepared for trial, and that Appellant, in his self-representation role, had announced that he was ready for trial.

The State presented four witnesses, as well as a video of the drug purchase, photographs of a prior drug purchase, photographs of the measured weight of the drugs that were purchased, and the drugs that were seized from both purchases.

Christopher Lockett, a patrol officer with the Mineral Wells Police Department at the time of the alleged offense, and Investigator Rose Lopez, a criminal investigator with the Department of Public Safety (DPS) in the Mineral Wells field office, oversaw the investigation that resulted in Appellant's arrest and indictment for the charged offense.

Officer Lockett testified that he engaged V.P. to be a confidential informant to assist him in investigating drug offenses. Officer Lockett "heard on the streets" that Appellant was selling drugs, and V.P., who he had used as a confidential informant in other controlled buys, informed him that V.P. could purchase methamphetamine from Appellant.

On April 25, 2021, the day of the offense, V.P. met with Officer Lockett and Investigator Lopez; V.P. was searched and then given money to make the drug purchase. Law enforcement equipped V.P. with a cell phone to capture audio and video recordings of the transaction with Appellant. Officer Lockett testified that through live streaming video from the cell phone that was provided to V.P. he was able to see and hear the entire interaction between V.P. and Appellant. The video was admitted into evidence without objection. Officer Lockett testified about the events captured in the video as it was published to the jury. Three still photographs from the video—which depicted (1) Officer Lockett weighing the drugs that V.P. had purchased from Appellant, (2) Appellant sitting on a bed, and (3) Appellant at another moment—were also admitted without objection. Officer Lockett also identified Appellant as the person in the video and the still photographs.

6

Officer Lockett testified that after V.P. purchased the drugs from Appellant, V.P. returned directly to him and gave him the drugs. He then performed a presumptive field test, which revealed a positive result for methamphetamine. Investigator Lopez testified that, pursuant to law enforcement protocols for working with confidential informants, she searched V.P. for contraband before and after the controlled purchase from Appellant, and V.P. had no drugs or contraband other than the methamphetamine that V.P. had purchased from Appellant.

On cross-examination, Appellant offered a video of a prior instance in which V.P. had purchased drugs from him as a confidential informant on March 21 of the same year; it was admitted. Appellant asked Officer Lockett whether V.P. was alone during that prior drug purchase, as seen on the video; Officer Lockett testified that V.P. was. Appellant asked if the video shows V.P. speaking to someone named "Brenda" and whether V.P. was accompanied by Brenda at this prior drug deal. Officer Lockett testified that the video does not show anyone saying "Brenda" in the video, rather, V.P. is shown responding to Appellant by referring to V.P. as "Red." Officer Lockett testified that a person who acts as a middleman in a drug transaction at the request of someone else who is seeking to purchase methamphetamine is still involved in the distribution of methamphetamine. In this prior drug transaction, V.P. purchased 1.32 grams of methamphetamine from Appellant at a different residence about a block away from the residence that was used in the charged offense. In the video of this prior drug transaction, Appellant chops methamphetamine on a plate, puts approximately a gram into a baggy, weighs it, and then gives it to V.P.

Ruth Dunnahoo, the evidence custodian for the Mineral Wells Police Department, explained the chain of custody protocol that the police department follows, and testified that she sent each baggie containing drugs, from the March and April controlled purchases between V.P. and Appellant, and as monitored by Officer Lockett, to the DPS laboratory in Abilene for analysis. For each sample, the DPS

laboratory analysis confirmed the presence of methamphetamine—the amount from the purchase in March was 1.32 grams, while the amount from the purchase in April was 5.83 grams.

V.P. testified that V.P. has two prior theft convictions from 2016 and 2020, respectively. V.P. testified that V.P. contacted law enforcement about being a confidential informant because V.P.'s children had been removed eight years ago and V.P. wanted to become sober and clean from using drugs. As a confidential informant, V.P. would meet with law enforcement; they would search V.P. and provide a recording device and money in which to purchase drugs. V.P. knows Appellant through V.P.'s mother-in-law, Brenda, who would purchase drugs from Appellant. On March 21, V.P. first met with law enforcement, then went to Appellant's residence and purchased about a gram of methamphetamine from him and returned to law enforcement with the drugs. V.P. captured this transaction on the video that had already been offered by Appellant and admitted into evidence. Law enforcement paid V.P. $50 for participating in this transaction.

On April 25, V.P. again met with law enforcement; they gave V.P. $180 to purchase a "quarter," or seven grams of methamphetamine, from Appellant. Equipped with a cell phone provided by law enforcement to record the transaction, V.P. knocked on the front door and entered Appellant's residence, which was a different location than where the March 21 transaction had occurred. Because Appellant did not have the drugs with him, he used the cell phone provided to V.P. to make several short calls. Appellant eventually also used his own cell phone. V.P. testified that "some people" eventually arrived to deliver the drugs to Appellant; he went outside to meet them, and V.P. stayed inside the residence. When Appellant returned, he asked V.P. to give him some of the drugs that V.P. had received from him. At this point, V.P. had already given Appellant the money to be used for this drug purchase. V.P. removed an amount of methamphetamine from the bag to give

8

to Appellant and asked him if it was enough, to which he responded in the negative—so V.P. gave him more, about a gram in total. After this, V.P. left Appellant's residence and reported back to law enforcement. Law enforcement again paid V.P. $50 for participating.

Appellant testified that he does not believe the solution to drugs is to "say lock them up," because an addict will always be an addict. He testified that he is an addict and has been despite receiving treatment for his addiction. He stopped using drugs thirty years ago due to participating in AA and his faith in God. After his father died, his siblings turned against him, he became homeless, and he began drinking and using drugs again. He started living in "a shack" and buying and using drugs there; he also began purchasing larger quantities of drugs and would have other people join him at the shack to use drugs. He explained that if he did not have any drugs, someone else would, and if he was at someone else's house, they would share some of their drugs with him. According to Appellant, this was part of the culture. He testified that none of the people that he associated with were drug dealers because "drug dealers is [sic] not going to sit around and socialize with you. . . . They're in it for the money." He testified that he has a job and moved to a better residence that he rents.

Appellant testified that he does not sell drugs, but that V.P. asked for some drugs from him because he knows people. He accused V.P. of being a drug dealer and stated that he knew V.P. was probably getting "ripped . . . off a lot." He testified that using drugs was not a choice, and that people did not understand that drug addiction is a disease that requires help from other people. He testified that given the choice, he would not use drugs, but that he does not have a choice because "it's a brain thing. It's a mental thing." Appellant graduated high school in Mineral Wells and attended Texas College, and he testified that he had obtained a college degree.

9

On cross-examination, Appellant admitted that he used drugs before his father died. Appellant claimed that although V.P. brought money to both transactions, he did not receive any money from V.P., and he suggested that V.P. may have taken it. He testified that the videos of the drug transactions were inaccurate, and he did not deliver any drugs to V.P. He agreed that, during the April 25 transaction, after he delivered the methamphetamine to V.P., he told V.P. to give him some of it and then asked V.P. for more than was initially offered. He testified that although he does not keep any drugs in his house he usually has "about 20" for his personal use. He testified that he was not forcing anyone to use drugs by giving them to others, that "anybody [he] messed with, they [sic] already in drugs."

In its charge, the trial court instructed the jury on the defense of entrapment. After deliberating, the jury returned a guilty verdict. At the punishment phase, Appellant pled "true" to the enhancement allegations and the trial court admitted the State's evidence of Appellant's four prior felony convictions for: (1) aggravated robbery committed in 1975, to which he pled guilty and was sentenced to ten years' imprisonment; (2) delivery of a controlled substance (amphetamine) committed in 1985, for which a jury convicted him and assessed his punishment at ten years' imprisonment; (3) sexual assault committed in 1985, for which a jury convicted him and assessed his punishment at twenty years' imprisonment; and (4) retaliation committed in 1992, to which he pled guilty and was sentenced to five years' imprisonment.

When Appellant stated that he desired to testify during the punishment phase, the trial court stated: "Okay, Same admonishments. You understand the dangers with that?" Appellant confirmed that he did. Appellant testified that his prior convictions had occurred about forty years ago and that he had grandchildren. He admitted he had "been in and out of the criminal justice system" most of his life and that he was charged with felony-assault family violence in 2020; this charge was

10

reduced to a misdemeanor, and he paid a fine. He also testified that he had prior parole violations because of drug use.

Outside the presence of the jury, Appellant stated that he was tricked into pleading "true" to the enhancement allegations. While the trial court read the sentencing instructions to the jury, Appellant attempted three times to object to the instructions that pertained to his prior convictions. He again objected during the State's closing argument to any mention of his prior convictions. During his closing argument, Appellant stated he had been to prison and served his time, and that he was not a habitual criminal. He stated that his past convictions did not cause any harm to the jury or the community, that his former attorney was a criminal, and that he was not receiving a fair trial. The jury returned a punishment verdict of life imprisonment.

## II. *Analysis*

### A. *Legal Sufficiency of the Evidence*

In his first two issues, Appellant asserts that the evidence is legally insufficient to support his conviction because (1) the State failed to disprove his entrapment defense, and (2) excluding V.P.'s testimony, there is legally insufficient evidence to connect him to the charged offense.[3]

#### 1. *Standard of Review*

A review of the jury's rejection of an entrapment defense focuses on the legal sufficiency of the evidence. *See Bien v. State*, 530 S.W.3d 177, 183 (Tex. App.—Eastland 2016), *aff'd*, 550 S.W.3d 180 (Tex. Crim. App. 2018); *Hernandez v. State*, 161 S.W.3d 491, 500 (Tex. Crim. App. 2005). When a defendant challenges the sufficiency of the evidence to support the rejection of a defense raised by him, including the defense of entrapment, we examine all the evidence in the light most

---

[3]In addition to the merits arguments that we address below, the State contends that Appellant inadequately briefed his first and second issues. We disagree.

favorable to the verdict to determine whether a rational jury could have found the defendant guilty of all essential elements of the charged offense beyond a reasonable doubt and also could have found against the defendant on the entrapment defense beyond a reasonable doubt. *Barron v. State*, 630 S.W.3d 392, 402–03 (Tex. App.— Eastland 2021, pet. ref'd) (citing *Saxon v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991)); *see also Braughton v. State*, 569 S.W.3d 592, 609 (Tex. Crim. App. 2018).

We review a challenge to the sufficiency of the evidence, regardless of whether it is framed as a legal or factual sufficiency challenge, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Garcia v. State*, 667 S.W.3d 756, 761 (Tex. Crim. App. 2023); *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

Viewing the evidence in the light most favorable to the verdict requires that we consider all of the evidence admitted at trial, including improperly admitted evidence. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Lee v. State*, 676 S.W.3d 912, 915 (Tex. App.—Eastland 2023, no pet.). As such, we defer to the factfinder's credibility and weight determinations because the factfinder is the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *See* CRIM. PROC. art. 36.13 (West 2007); *Garcia*, 667 S.W.3d at 762; *Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899; *Clayton*, 235 S.W.3d at 778. This deference accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the

evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Garcia*, 667 S.W.3d at 761; *Clayton*, 235 S.W.3d at 778. We may not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Therefore, if the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Garcia*, 667 S.W.3d at 762; *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Clayton*, 235 S.W.3d at 778.

Because the standard of review is the same, we treat direct and circumstantial evidence equally. *Isassi*, 330 S.W.3d at 638; *Clayton*, 235 S.W.3d at 778; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *Ruiz v. State*, 631 S.W.3d 841, 851 (Tex. App.—Eastland 2021, pet. ref'd). It is not necessary that the evidence directly prove the defendant's guilt. Rather, circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor and can, without more, be sufficient to establish his guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper*, 214 S.W.3d at 13); *Lee*, 676 S.W.3d at 915. A guilty verdict does not require that every fact must directly and independently prove a defendant's guilt if the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Therefore, in evaluating the sufficiency of the evidence, we must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015).

Finally, we measure the sufficiency of the evidence by the elements of the charged offense as defined by the hypothetically correct charge for the case. *Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016); *see also Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). In this regard, to determine whether

the State has met its burden to prove a defendant's guilt beyond a reasonable doubt under the *Jackson* standard, we compare the elements of the offense to the evidence adduced at trial. *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014) (citing *Malik*, 953 S.W.2d at 240). The hypothetically correct charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240.

### 2. *Entrapment Defense*

As relevant to this case, a person commits the first-degree felony offense of delivery of methamphetamine if the person knowingly delivers methamphetamine, a controlled substance listed in Penalty Group 1, in amount of four grams or more or less than two hundred grams. HEALTH & SAFETY §§ 481.102(6); 481.112(a), (d).

Entrapment is a defense to prosecution when "the actor engaged in the [charged] conduct because he was induced to do so by a law enforcement agent [who used] persuasion or other means [that was] likely to cause [a person] to commit the offense. Conduct [that] merely afford[s] a person an opportunity to commit an offense does not constitute entrapment." PENAL § 8.06(a) (West 2021). To satisfy the requirements of the entrapment defense, a defendant must produce prima facie evidence that demonstrates (1) he engaged in the conduct charged, (2) because he was actually induced to commit the offense by a law enforcement agent, (3) who used persuasion or other means, and (4) the inducement would have caused an ordinary law-abiding citizen of average resistance to nevertheless commit the offense. *See Hernandez*, 161 S.W.3d at 497; *England v. State*, 887 S.W.2d 902, 908 (Tex. Crim. App. 1994). Because entrapment is a defense to prosecution rather than an affirmative defense, the defendant has the initial burden to produce evidence that raises the defense; the burden then shifts to the State to disprove the defense beyond

a reasonable doubt. PENAL § 2.03. "In this burden-shifting context, entrapment acts like a justification defense such as self-defense." *Hernandez*, 161 S.W.3d at 498. In this regard, if a defendant raises a justification defense, a determination of guilt by the jury is an implicit rejection of the asserted defensive theory. *See Barron*, 630 S.W.3d at 403 (citing *Zuliani v. State*, 97 S.W.3d 589, 594–95 (Tex. Crim. App. 2003)); *Hernandez*, 161 S.W.3d at 500 & n.27.

The State contends that Appellant failed to make a prima facie showing that he was "actually induced" to commit the charged offense because his defensive strategy at trial was that he was not guilty of this offense—his primary argument was that he was a drug *user*, not a drug *dealer*. In his brief, Appellant emphasizes that V.P. "had every incentive (i.e. money) to 'encourage' a transaction that otherwise would not have occurred" and that Appellant did not have drugs at his residence but rather he needed to call a third party to deliver them to him. Appellant argues that because he did not have possession of the methamphetamine, if V.P. had not urged Appellant to have someone else deliver the methamphetamine to him the transaction would have never occurred—"a textbook case of entrapment," Appellant asserts. He also contends that the trial court must have agreed with his argument because it submitted his requested entrapment issue in its charge.

First, instructing the jury on the law of entrapment is not a comment on the weight of the evidence, as Appellant suggests. Article 36.14 of the Code of Criminal Procedure requires that the trial court submit a written charge that distinctly sets forth the law applicable to the case and does not express any opinion as to the weight of the evidence. CRIM. PROC. art. 36.14. Here, the trial court set forth the law of entrapment in its charge, and doing so did not constitute a comment on the weight of the evidence. *See id.*; *Morales v. State*, 357 S.W.3d 1, 5 n.15 (Tex. Crim. App. 2011); *Walters v. State*, 247 S.W.3d 204, 211 (Tex. Crim. App. 2007).

Next, the evidence establishes that V.P. asked Appellant to help V.P. purchase methamphetamine, and he did. He made several phone calls to have methamphetamine delivered to his house, and when the drugs were delivered there, he went outside to secure them, leaving V.P. inside; he then delivered the drugs to V.P. inside his home, and he kept a portion of the methamphetamine for himself. As further evidence that Appellant was not "actually induced" by V.P., a prior instance of him delivering methamphetamine to V.P. was admitted whereby he had the drugs at his residence, and he provided them to V.P. Moreover, Appellant testified that he "helped" V.P. obtain drugs because he was an addict helping another addict.

We agree with the State that (1) V.P.'s conduct, at most, created an opportunity for Appellant to commit the offense, (2) Appellant did not commit the offense because of any persuasive inducement by V.P., and (3) V.P.'s conduct was not so persuasive that a law-abiding citizen of ordinary resistance would nevertheless have committed this offense. *See Bien*, 530 S.W.3d at 183–86; *see also Hernandez*, 161 S.W.3d at 497; *England*, 887 S.W.2d at 908. Moreover, the jury's finding of Appellant's guilt is an implicit rejection of his entrapment defense. *See Barron*, 630 S.W.3d at 403 (citing *Zuliani*, 97 S.W.3d at 589, 594); *Hernandez*, 161 S.W.3d at 500 & n.27.

Viewing the evidence in the light most favorable to the jury's verdict, we conclude that the State adduced sufficient evidence from which a rational trier of fact could have logically inferred and found beyond a reasonable doubt the essential elements of the charged offense and could have also found against Appellant on his entrapment defense beyond a reasonable doubt. *Hernandez*, 161 S.W.3d at 500; *Bien*, 530 S.W.3d at 183.

Accordingly, we overrule Appellant's first issue.

### 3. *Evidence Corroborating the Confidential Informant*

A person may not be convicted of an offense based on the testimony of a confidential informant, unless such testimony is corroborated by other evidence that tends to connect the defendant with the offense committed. *See* CRIM. PROC. art. 38.141(a). Corroboration is not sufficient if it only shows the commission of the offense. *Id.* art. 38.141(b). Appellant contends that the only corroborating evidence presented in this case merely shows the commission of the offense. We disagree: the corroborating evidence tends to *link Appellant* to the commission of the offense. *See* CRIM. PROC. art. 38.141(a).

When evaluating the sufficiency of corroboration evidence, we eliminate the confidential informant's testimony from consideration and then examine the remainder of the record to determine if other evidence tends to connect the defendant to the commission of the offense. *Malone v. State*, 253 S.W.3d 253, 257–58 (Tex. Crim. App. 2008). To meet the requirements of this rule, corroborating evidence need not alone prove the defendant's guilt beyond a reasonable doubt; rather, it must simply *link* the defendant in some way to the commission of the offense and show that rational jurors could conclude that this evidence sufficiently tended to connect the defendant to the charged offense. *Id.* at 257.

Disregarding V.P.'s testimony, the record includes the testimony of two law enforcement officers (Officer Lockett and Investigator Lopez), Appellant, and the multiple trial exhibits offered by the State and Appellant and admitted by the trial court. Officer Lockett testified that he used V.P. as a confidential informant in this case and had on previous occasions, and that he "heard" that Appellant was selling drugs. V.P. informed him that V.P. could purchase methamphetamine from Appellant and Officer Lockett executed controlled purchases of drugs from Appellant with V.P.'s participation. Officer Lockett observed these transactions firsthand on the live feed from the cell phone he had provided to V.P. Investigator

Lopez searched V.P. before and after each transaction, and V.P. only possessed the methamphetamine that was obtained from Appellant. Officer Lockett's testimony and the video footage of these transactions, without more, sufficiently corroborates V.P.'s testimony because this evidence tends to connect Appellant to the charged offense. *See Cook v. State*, 460 S.W.3d 703, 709–10 (Tex. App.—Eastland 2015, no pet.) (upholding a conviction based on corroborating evidence with similar facts).

Accordingly, we overrule Appellant's second issue.

B. *The Right to Self-Representation*

In his third issue, Appellant contends that his waiver of his right to counsel was not made knowingly, voluntarily, or intelligently and is therefore invalid.

Every criminal defendant has a constitutional right to the assistance of counsel and a constitutional right to self-representation. U.S. CONST. amend. VI; TEX. CONST. art. I, § 10. The right to self-representation is separate from the right to the assistance of counsel, and to choose one is to forego the other. *Osorio-Lopez v. State*, 663 S.W.3d 750, 756 (Tex. Crim. App. 2022) (citing *United States v. Purnett*, 910 F.2d 51, 54 (2d Cir. 1990)). But, to proceed pro se, a defendant must knowingly, voluntarily, and intelligently waive his right to counsel, *and* clearly and unequivocally assert his right to self-representation. *Id.* (citing *Faretta v. California*, 422 U.S. 806, 835 (1975)).

A knowing, voluntary, and intelligent waiver requires a showing that the defendant was warned of the "dangers and disadvantages of self-representation," and that "his choice [was] made with eyes open." *Faretta*, 422 U.S. at 835; *Osorio-Lopez*, 663 S.W.3d at 756. Whether the waiver of the right to assistance of counsel was effective depends on the totality of the circumstances, including the consideration of a defendant's background, experience, and conduct. *Osorio-Lopez*, 663 S.W.3d at 756. The admonishments to the defendant that are required likewise depend on the totality of the circumstances. *See Huggins v. State*, 674 S.W.3d 538,

541 (Tex. Crim. App. 2023) (citing *Iowa v. Tovar*, 541 U.S. 77, 88 (2004)). A trial court, when admonishing a defendant, is not obligated to follow a specific line of questioning or "script" to ensure that a defendant who has asserted his right to self-representation is doing so "with eyes open." *Osorio-Lopez*, 663 S.W.3d at 757 (citing *Burgess v. State*, 816 S.W.2d 424, 428 (Tex. Crim. App. 1991)). The focus of the trial court's admonishments is not whether the defendant is equipped to represent himself at trial, but rather whether the defendant understands the consequences of his choice to proceed pro se. *Id.* (citing *Godinez v. Moran*, 509 U.S. 389, 400–01 (1993)). Further, if the trial court determines that a waiver of the right to counsel is knowingly, voluntarily, and intelligently made, the trial court shall provide the defendant with a written waiver to sign. *See* CRIM. PROC. art. 1.051(g); *Osario-Lopez*, 663 S.W.3d at 757.

In this scenario, if (1) the defendant clearly and unequivocally declares to the trial court that he desires to represent himself and does not want the assistance of counsel, (2) the record affirmatively demonstrates that the defendant is literate and has a sufficient understanding of the risks of proceeding pro se and that he is knowingly, voluntarily, and intelligently exercising his informed choice, and (3) the trial court adequately warns the defendant of its opinion that it is a mistake to proceed pro se and to not accept the assistance of counsel, and that the defendant will be required to comply with all applicable laws, rules of procedure, and rules of evidence, then the invocation of the defendant's right to self-representation cannot be refused. *See Dolph v. State*, 440 S.W.3d 898, 902 (Tex. App.—Texarkana 2013, pet. ref'd) (citing *Faretta*, 422 U.S. at 835–36).

Appellant contends that the trial court failed to properly admonish him of the dangers and disadvantages of self-representation; therefore, his waiver of his right to the assistance of counsel was not knowingly, voluntarily, and intelligently made. He also contends that the totality of the circumstances show that he never wanted to

proceed pro se but instead desired the appointment of new trial counsel. The record before us does not support Appellant's assertions.

Here, the trial court thoroughly admonished Appellant on the record about the dangers and disadvantages of self-representation. The trial court also "strongly advised" Appellant to allow his court-appointed trial counsel to represent him and stated that Appellant was "making a bad decision by not having [Appellant's court-appointed trial counsel] sit there with you at this trial. I can't stress that enough." Despite this, Appellant insisted that he understood what had been explained to him and that he nevertheless desired to represent himself. The trial court also provided written admonishments to Appellant, which Appellant signed and stated that he understood. Appellant was literate: he graduated high school in Mineral Wells, attended Texas College, and obtained a college degree. He filed several handwritten pro se motions and letters throughout the duration of this case. Further, with Appellant's previous criminal prosecutions, he had proceeded to a jury trial at least twice and had filed pro se motions in other cases.

We conclude, and the record clearly shows, that the trial court thoroughly admonished Appellant regarding the disadvantages and dangers of self-representation, and that Appellant understood those admonishments but nevertheless knowingly, voluntarily, and intelligently chose to proceed pro se. *See Gomez*, 686 S.W.3d at 436–37 (The focus of the trial court's admonishments is not whether the defendant is equipped to represent himself at trial, but whether the defendant understand his choice to proceed pro se.).

In addition to his contention that he was not adequately apprised of the dangers and disadvantages of self-representation, Appellant's argument also focuses on his alleged desire to be represented, but not by his court-appointed trial counsel. Appellant's assertions that his court-appointed trial counsel was not advocating on his behalf were thoroughly addressed by the trial court, and Appellant repeatedly

20

and firmly expressed his desire to represent himself. The trial court read the charges to Appellant as stated in the indictment and Appellant stated that he understood them. Indulging every reasonable inference against a waiver and considering the totality of the circumstances, we conclude that the evidence strongly supports that Appellant knowingly, voluntarily, and intelligently waived his right to counsel, and clearly and unequivocally exercised his right to self-representation. *See Gomez*, 686 S.W.3d at 436–37; *Barski v. State*, No. 11-13-00217-CR, 2015 WL 5192320, at *4 (Tex. App.—Eastland Aug. 21, 2015, pet. ref'd) (mem. op., not designated for publication); *Dolph*, 440 S.W.3d at 902–04 (citing *Faretta*, 422 U.S. at 835–36).

Accordingly, we overrule Appellant's third issue.

C. *Cruel and Unusual Punishment*

In his fourth issue, Appellant complains that the sentence imposed is grossly disproportionate for the charged offense, especially because "such an extreme passage of time [had elapsed] prior to any new offenses." The basis of his argument rests on the assertion that his prior felony convictions occurred many years ago—in 1975, 1985, 1986, and 1992. The State responds that (1) Appellant failed to preserve this issue for appellate review, (2) Appellant failed to adequately brief this issue, and (3) his sentence is not cruel and unusual.

1. *Preservation and Briefing the Issue*

The State contends that Appellant did not object in the trial court that his sentence violated the Eighth Amendment's prohibition against cruel and unusual punishment. To preserve a complaint of cruel and unusual punishment for appellate review, a defendant must either object when his sentence is imposed or file a motion for new trial. *See* TEX. R. APP. P. 33.1(a); *Meza v. State*, No. 11-24-00081-CR, 2025 WL 2665323, at *3 (Tex. App.—Eastland Sept. 18, 2025, no pet.) (mem. op., not designated for publication) (citing *Burt v. State*, 396 S.W.3d 574, 577 (Tex. Crim. App. 2013)); *Amparan v. State*, No. 11-21-00162-CR, 2022 WL 17684377, at *2

(Tex. App.—Eastland Dec. 15, 2022, no pet.) (mem. op., not designated for publication).

In this instance, Appellant did not object when the trial court pronounced his sentence; instead, he merely stated to the trial court that he was unaware of any legal reason why his sentence should not be pronounced at that time. Although Appellant filed a motion for new trial, his motion did not raise this complaint. Thus, Appellant failed to raise this issue in the trial court and has thus waived it for appellate review. *See* TEX. R. APP. P. 33.1(a); *Meza*, 2025 WL 2665323, at \*3; *Amparan*, 2022 WL 17684377, at \*2.

Moreover, Appellant has also waived this issue because he did not adequately brief it. TEX. R. APP. P. 38.1(i). A party's argument is waived as inadequately briefed if, among other reasons, the party's brief neglects to include "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." *Id.*; *see Arevalo v. State*, 675 S.W.3d 833, 845 (Tex. App.—Eastland 2023, no pet.) (citing *Ybarra v. State*, 621 S.W.3d 371, 379 n.3 (Tex. App.—Eastland 2021, pet. ref'd)). In his brief, Appellant states that his life sentence is grossly disproportionate to the charged offense in violation of the Eighth Amendment's protections against cruel and unusual punishment. He cites appropriate authority that describes gross disproportionality as an exception to the general rule that a sentence that falls within the applicable statutory range of punishment generally is not excessive under the Eighth Amendment. However, the only argument made by Appellant on this point is that his *prior convictions* "were not proper enhancements due to how old the offenses were . . ." and because there had been "such an extreme passage of time prior to [him committing] any new offenses, [his sentence] is grossly disproportionate." Not only does this argument fail to frame or engage in a gross-disproportionality analysis, Appellant also fails to address that, even without any enhancement findings, the statutory range of

22

punishment for a first-degree felony offense for which he was charged *already encompassed* the life sentence that he received. *See* HEALTH & SAFETY § 481.112(d) ("An offense under Subsection (a) is a felony of the first degree if the amount of the controlled substance . . . is . . . four grams or more but less than 200 grams."); PENAL § 12.32(a) ("An individual adjudged guilty of a felony of the first degree shall be punishable by imprisonment . . . for life.").

Here, Appellant's enhancement allegations, which were found to be "true," served to raise the applicable punishment range to a habitual status which in turn increased the *minimum* sentence that could be imposed. The legislature similarly structured the statute that governs the charged offense: for offenses in which the amount of the controlled substance exceeds 200 or 400 grams of aggregate weight, the punishment *floor* is raised. *See* HEALTH & SAFETY § 481.112(e)–(f) (raising the minimum punishment to ten and fifteen years, respectively); PENAL § 12.42(d) (raising the punishment minimum to twenty-five years for habitual offenders).

We conclude that, irrespective of having failed to properly raise this issue, the omission of any substantive analysis of the alleged gross disproportionality of Appellant's sentence renders the issue waived. *See Lucio v. State*, 351 S.W.3d 878, 896 (Tex. Crim. App. 2011); *Arevalo*, 675 S.W.3d at 847; *see also Wade v. State*, No. 02-21-00206-CR, 2023 WL 1859797, at *3 (Tex. App.—Fort Worth Feb. 9, 2023, no pet.) (mem. op., not designated for publication) (stating that appellant's gross-disproportionality issue was "arguably" forfeited because he did not argue the correct standard) (citing *Bolar v. State*, 625 S.W.3d 659, 666 (Tex. App.—Fort Worth 2021, no pet.)).

### 2. *Gross Disproportionality of Sentence*

Nevertheless, we conclude that the sentence imposed by the trial court in this case is not unconstitutionally disproportionate to the charged offense. *See, e.g., Meza*, 2025 WL 2665323, at *3; *Amparan*, 2022 WL 17684377, at *2.

When we review a trial court's sentencing determination, we note that trial courts are afforded "a great deal of discretion" in sentencing decisions. *Renfroe v. State*, 529 S.W.3d 229, 233 (Tex. App.—Eastland 2017, pet. ref'd) (quoting *Jackson v. State*, 680 S.W.2d 809, 814 (Tex. Crim. App. 1984)). Therefore, we will not disturb a trial court's punishment decision absent a showing of an abuse of discretion and harm. *Id.*

When a sentence falls within the applicable statutory range of punishment, it is generally not considered to be "excessive, cruel, or unusual." *State v. Simpson*, 488 S.W.3d 318, 323 (Tex. Crim. App. 2016). However, a person's sentence may constitute cruel and unusual punishment, despite falling within the applicable statutory range, if it is grossly disproportionate to the offenses or sentences for other similar offenses. *Renfroe*, 529 S.W.3d at 233. Nevertheless, "[o]utside the context of capital punishment, *successful* challenges to the proportionality of particular sentences [will be] exceedingly rare." *Solem v. Helm*, 463 U.S. 277, 289–90 (1983) (quoting *Rummel v. Estelle*, 445 U.S. 263, 272 (1980)).

To evaluate the proportionality of a sentence, the first step is to make a threshold comparison between the gravity of the offense for which the defendant was convicted, and the severity of the sentence imposed. *Simpson*, 488 S.W.3d at 322; *Renfroe*, 529 S.W.3d at 234. When we analyze the gravity of the convicted offense, we review (1) the harm caused or threatened to the victim, (2) the culpability of the offender, and (3) the offender's criminal history. *Simpson*, 488 S.W.3d at 323; *Renfroe*, 529 S.W.3d at 234. We weigh these factors against the defendant's sentence, looking to precedent for guidance as to the constitutional limits of proportional severity. *See Hutto v. Davis*, 454 U.S. 370, 374–75 (1982).

If we do not find a gross disproportionality, our analysis ends there. *See Harmelin v. Michigan*, 501 U.S. 957, 1005 (1991) (Kennedy, J., concurring); *Renfroe*, 529 S.W.3d at 234. Only if the sentence imposed is grossly

24

disproportionate to the charged offense must we then proceed to steps two and three and compare the defendant's sentence with sentences that were imposed for similar crimes in this jurisdiction or other jurisdictions. *Simpson*, 488 S.W.3d at 323; *Bradfield v. State*, 42 S.W.3d 350, 353–54 (Tex. App.—Eastland 2001, pet. ref'd).

The punishment range for a first-degree felony offense is imprisonment for no less than five years but no more than ninety-nine years, or life. PENAL § 12.32(a). In addition to the term of imprisonment imposed, a fine not to exceed $10,000 may be assessed against the convicted defendant. *Id.* § 12.32(b). Because of the enhancement findings, the jury was required to assess Appellant's punishment within the statutory range for a habitual offender. CRIM. PROC. art. 37.07, § 4(b); PENAL § 12.42(d). Here, and irrespective of Appellant's habitual offender status, the sentence of life imprisonment recommended by the jury, and imposed by the trial court, falls within the punishment range prescribed by the legislature for the offense for which Appellant was convicted. *Id.* § 12.32.

Further, Appellant's sentence is not grossly disproportionate because the gravity of his offense is high. *See Simpson*, 488 S.W.3d at 323. First, his crime, the distribution of illegal drugs, is a serious offense and is recognized as one that creates grave harm to society. *See, e.g.*, *Bolar*, 625 S.W.3d at 669 ("Texas law classifies the distribution of illegal drugs as a grave harm to society.") (quoting *Harmelin*, 501 U.S. at 1002) (Kennedy, J., concurring in part and concurring in the judgment). Second, Appellant's culpability was high. *See id.* at 666 ("In analyzing a defendant's culpability, we consider such factors as the defendant's age at the time of the offense, his motive and intent to commit the crime, his role as the primary actor or as a party to the offense, and his acceptance of responsibility."). Appellant was captured on video selling illegal drugs to V.P. on two separate occasions. Appellant testified that he routinely kept illegal drugs in his home for personal use and would use and share them with others. He also helps others, including V.P., obtain illegal drugs.

Appellant asserted that he could not stop *using* illegal drugs but denied that he was a drug *dealer*. He was over sixty at the time this offense was committed and his felony criminal history spanned more than fifty years. Third, Appellant's extensive criminal history included at least four prior felony convictions—aggravated robbery, sexual assault, delivery of a controlled substance (amphetamine), and retaliation—and, as recently as 2020, an assault family violence charge that he testified was reduced to a misdemeanor.

Based on the threshold factors that we must consider, we conclude that Appellant's sentence of life imprisonment, which is within the applicable statutory range of punishment for the offense for which he was convicted, does not give rise to an inference of disproportionality. Because his argument does not survive the threshold test, we need not compare his sentence to others for the same offense that were committed in Texas or elsewhere. *See id.* at 666; *Meza*, 2025 WL 2665323, at *3; *Starling v. State*, No. 11-22-00128-CR, 2023 WL 8631446, at *3 (Tex. App.—Eastland Dec. 14, 2023, no pet.) (mem. op., not designated for publication).

Accordingly, we overrule Appellant's fourth issue.

### III. *This Court's Ruling*

We affirm the judgment of the trial court.


W. STACY TROTTER

JUSTICE


January 15, 2026

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.